**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| **GUSTAVO GARCIA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 1:18-cv-01822 (APM)** |
| ) | |
| **MICHAEL POMPEO, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

---

## MEMORANDUM OPINION AND ORDER

I.

Plaintiff Gustavo Garcia is a dual citizen of the United States and Mexico who resides in Mexico. Over the course of several years, Plaintiff tried unsuccessfully to obtain employment with the U.S. Embassy in Mexico City. He came close in 2010, when he was conditionally hired for a position at the Embassy but was later denied a security certification, prompting his offer to be rescinded. Since then, Plaintiff has applied for various positions but without success. Plaintiff, on behalf of himself and others similarly situated, now sues the State Department, the Secretary of State, and the Attorney General, bringing a host of claims under Title VII, the Administrative Procedure Act, and the Constitution.

This case is before the court on Defendants' Motion to Dismiss and for Summary Judgment. For the reasons explained below, the court grants in part and denies in part Defendants' Motion.

## II.

Plaintiff is an attorney who lives and works in Mexico City, Mexico. First Am. Compl., ECF No. 4 [hereinafter FAC], ¶ 44. In January 2010, two Legal Assistant Resident Legal Advisor positions opened at the U.S. Embassy in Mexico City in the Department of Justice Office of Overseas Prosecutorial Development, Training, and Assistance. *Id.* ¶¶ 45–46. Plaintiff applied for the positions. *Id.* ¶ 47. Plaintiff interviewed for one of the positions and, in April 2010, received a conditional offer of employment. *Id.* ¶¶ 48–50. Plaintiff was informed that his employment was contingent upon being granted a security clearance or security certification. *See* Defs.' Statement of Material Facts, ECF No. 15-2 [hereinafter Statement of Facts], ¶ 1 (stating that Plaintiff's offer of employment was conditioned on him being granted a security *certification*); Pl.'s Resp. to Statement of Facts [hereinafter Pl.'s Resp. to Facts], ECF No. 19, ¶ 1 (stating that Plaintiff's offer was conditioned on him being granted a security *clearance*). A security certification involves a less rigorous background review than a security clearance. *See* Defs.' Mot. to Dismiss and for Summ. J., ECF No. 15 [hereinafter Defs.' Mot.], Ex. 17, Dep. of Timothy Haley, ECF No. 15-19 [hereinafter Haley Dep.], at 46–51. Shortly thereafter, Plaintiff was notified that his conditional offer of employment was withdrawn because he failed to obtain a security certification or clearance. Statement of Facts ¶ 2; Pl.'s Resp. to Facts ¶ 2. Later that year, the Plaintiff reapplied to the same position when it was reposted but was not selected. FAC ¶¶ 57–59. He also applied for other employment with the U.S. government in late 2010 and 2011 but again was unsuccessful. *Id.* ¶¶ 60–65.

In mid-October 2012, Plaintiff received responsive information from a Freedom of Information Act and Privacy Act request he made for records about himself. *Id.* ¶ 66. According to Plaintiff, "[t]he released records revealed that the [Embassy Regional Security Office ("RSO")]

had collected and maintained a significant amount of information about [Plaintiff's] First Amendment-protected activities," including "his involvement in protests against U.S. immigration policy, his participation in community groups, his publication of a book about the visa process, and his seminars about the visa process, and that it had denied him a security certification based on these activities." *Id.* ¶ 67.

Soon after receiving the records, Plaintiff sought equal employment opportunity ("EEO") counseling regarding the adverse security certification decision. Statement of Facts ¶ 3; Pl.'s Resp. to Facts ¶ 3. When counseling did not resolve the matter, Plaintiff filed a formal EEO complaint with the State Department in January 2013, claiming discrimination based on his dual citizenship. Defs.' Mot., Ex. 4, ECF No. 15-6, at 2. Plaintiff requested a hearing before the Equal Employment Opportunity Commission, at which point the State Department filed a motion to dismiss Plaintiff's claim as untimely. Statement of Facts ¶ 5; Pl.'s Resp. to Facts ¶ 38. The Administrative Law Judge denied the State Department's motion, finding "insufficient information to determine when [Plaintiff] reasonably suspected that he had been discriminated against to trigger the 45-day time limitation." Defs.' Mot., Ex. 7, Order, ECF No. 15-9. Plaintiff withdrew his request for a hearing, and the complaint was remanded to the State Department. Statement of Facts ¶ 7. In May 2018, the State Department issued a final agency decision concluding that Plaintiff had not suffered discrimination based on national origin. Defs.' Mot., Ex. 8, Final Agency Decision, ECF No. 15-10, at 17.

In the meantime, in June 2013, the Department of Justice Office of International Affairs ("OIA") advertised a paralegal position that required a security clearance. FAC ¶ 75. Two months later, in August 2013, three RSO employees allegedly met with representatives from the Mexico City Migrant Assistant Office. During that meeting, they discussed Plaintiff and made a number

of negative statements about him. *Id.* ¶ 76. Later that same month, Plaintiff contends, an RSO employee told another RSO employee that Plaintiff would be denied a security certification if he applied again. *Id.* ¶ 77. Plaintiff also alleges that between June 2013 and March 2014, the RSO discussed Plaintiff with the OIA and advised that "he could not pass or should not be passed through the background check." *Id.* ¶¶ 78–80. In March 2014, Plaintiff interviewed with an OIA hiring official, during which Plaintiff claims he was asked about his prior EEO activity. *Id.* ¶ 81. A month later, Plaintiff was advised that he was not selected for the paralegal position. *Id.* ¶ 82.

After being turned down for the OIA position, in May 2014, Plaintiff sought EEO counseling, this time asserting a claim of retaliation. Statement of Facts ¶ 8; Pl.'s Resp. to Facts ¶ 8; Defs.' Mot., Ex. 9, EEO Counselor's Report, ECF No. 15-11. When counseling did not resolve the dispute, Plaintiff filed a second formal EEO complaint, this time with the Department of Justice. FAC ¶ 83.

During the EEO proceedings, Plaintiff learned that the Mexico City Embassy stores the security files of those considered "Ordinarily Resident" in the Foreign Service National Investigators' ("FSNI") Office and that FSNIs have access to the security files. *Id.* ¶ 90. An "Ordinarily Resident" is defined as a foreign national or U.S. citizen who is locally resident and has legal, permanent resident status within the host country. *Id.* ¶ 25. During the period at issue in this case, the practice of the State Department was to conduct security *certifications* for all locally hired staff who did not require a security *clearance*, whether or not they were United States citizens. Haley Dep. at 46–51.

Plaintiff continued to apply for other Embassy positions but was not selected for any. *Id.* ¶¶ 84–89. For example, when the OIA again advertised the paralegal position in May 2014, Plaintiff reapplied for the job. *Id.* ¶¶ 84–85. In July 2014, Plaintiff was advised that he was not

selected for the position. *Id.* ¶ 86. He again unsuccessfully applied for a State Department position in 2015. *Id.* ¶¶ 88–89.

On August 3, 2018, Plaintiff filed suit against Defendants, challenging (1) his non-hiring based on the denial of his security certification; (2) the State Department's collection and retention of information pertaining to Plaintiff's involvement in various political, social, and professional groups; and (2) the State Department's failure to follow two internal operating regulations. Compl., ECF No. 1. Plaintiff brings claims under Title VII, the Administrative Procedure Act ("APA"), and the Constitution. *See generally id.*; FAC.

### III.

Defendants move both to dismiss Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(6) and for summary judgment under Rule 56. *See generally* Defs.' Mot. Both parties have submitted sworn affidavits and other evidence "outside the pleadings." *See* Fed. R. Civ. P. 12(d). Because the court does not exclude such evidence, it must treat Defendants' motion as one for summary judgment under Rule 56. *Id.* Accordingly, the court must determine whether a genuine issue of material fact exists as to any claim. Fed. R. Civ. P. 56(c).

A "genuine dispute" of a "material fact" exists when the fact is "capable of affecting the substantive outcome of the litigation" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015). In assessing a motion for summary judgment, the court considers all relevant evidence presented by the parties. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008). The court looks at the facts in the light most favorable to the nonmoving party and draws all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the court determines "no reasonable jury could reach a verdict in [the non-

movant's] favor," then summary judgment is appropriate. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016).

Before discussing the merits, the court notes two procedural aspects of the case in its present posture. First, only Defendants filed a statement of material facts as to which there is no genuine dispute. *See* LCvR 7(h) (requiring that summary judgment motions and oppositions be accompanied by statements of material facts); Statement of Facts. Although Plaintiff responded to Defendants' statement, *see* Pl.'s Resp. to Facts, and submitted over thirty exhibits, *see* Pl.'s Opp'n to Defs.' Mot., ECF No. 19 [hereinafter Pl.'s Opp'n], Exs. A–FF, ECF Nos. 19-1–19-32, he did not identify any material facts that he asserts are undisputed. Thus, insofar as undisputed facts go, the court is largely constrained to those asserted by Defendants. Second, the parties engaged in some discovery in the administrative proceedings but have yet to take any discovery in this matter. Defendants' motion therefore is before the court largely on an administratively compiled record.

## IV.

In Count I of his Complaint, Plaintiff alleges national origin discrimination under Title VII. FAC ¶¶ 94–100. He contends that the State Department "has a policy of processing all [persons who are "ordinarily resident" in Mexico, or ORs,] for security certifications, regardless of citizenship, despite the fact that that process may only be used for non-U.S. citizens." *Id.* ¶ 95. He adds that "[t]reating U.S. citizens as non-U.S. citizens constitutes prohibited national origin discrimination in violation of Title VII." *Id.* ¶ 96. Defendants respond that Plaintiff's claim is subject to dismissal because "he cannot demonstrate that [the Department of] State's reason for refusing him a security certification was motivated by national origin discrimination," because "[a]t bottom, [Plaintiff's] claim does not protest discrimination based on national origin; it seeks

to compel discrimination based on citizenship," and "Title VII contains no such mandate." Defs.'
Mot. at 11–12. The court agrees.

Title VII discrimination claims are evaluated under the three-step *McDonnell-Douglas*
burden-shifting framework. *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566, 574 (D.C. Cir.
2019) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). "[A] Title VII plaintiff
seeking to prove disparate treatment through indirect, circumstantial evidence 'must first establish
a prima facie case of prohibited discrimination.'" *Cruz v. McAleenan*, 931 F.3d 1186, 1191 (D.C.
Cir. 2019) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998)). Once a
plaintiff has established her prima facie case, the burden shifts to the employer to articulate a
legitimate nondiscriminatory reason for the challenged employment decision. *Id.* Finally, if the
employer articulates such a reason, the burden shifts back to the plaintiff to prove that the reasons
offered by the employer are a pretext for discrimination. *Id.*

Plaintiff's case fails at the first step. Although Plaintiff labels his discrimination claim as
one based on "national origin," in truth Plaintiff has alleged discrimination based solely on his
status as a U.S. citizen. *See* FAC ¶ 96 ("Treating U.S. citizens as non-U.S. citizens constitutes
prohibited national origin discrimination in violation of Title VII."). Discrimination on the basis
of citizenship cannot, however, form the basis of a Title VII claim. As the Supreme Court held in
*Espinoza v. Farah Manufacturing Co.*, "nothing in the [Title VII] makes it illegal to discriminate
on the basis of citizenship or alienage." 414 U.S. 86, 95 (1973); *see also Anderson v. Zubieta*, 180
F.3d 329, 340 (D.C. Cir. 1999) (recognizing that the Supreme Court in *Espinoza* held that
"citizenship is not a facially-unlawful criterion for employment decisions"); *Khaksari v.
Chairman, Broad. Bd. of Governors*, 451 F. App'x 1, 3 (D.C. Cir. 2011) ("'American citizenship'
is not a protected category under Title VII . . . ."). Although courts have recognized that "an

employer might use a citizenship test as a pretext to disguise what is in fact national-origin discrimination," *Anderson*, 180 F.3d at 340 (quoting *Espinoza*, 414 U.S. at 92), Plaintiff has made no such contention here. He has not, for example, suggested that the State Department was requiring security certifications only from U.S. citizens born in a particular place. Rather, his charge is that everyone, citizens and non-citizens alike, regardless of birthplace or national origin, were being treated the same, when he should have been advantaged as a U.S. citizen and not subject to a security review. Accordingly, Plaintiff cannot establish a prima facie case of Title VII discrimination because he cannot show that he was a member of a class protected under the statute. The court therefore grants summary judgment to Defendants on Count I.

Before proceeding to the next claim, the court addresses two other issues relating to Count I. The parties spill significant ink on the issue of whether the State Department's security certification decision is reviewable under *Department of the Navy v. Egan*, 484 U.S. 518 (1988) (holding that the Merit Systems Protection Board did not have the authority to review the Navy's denial of a security clearance). The parties' back-and-forth misses the nature of the claim. Plaintiff does not contend that he was in fact deserving of a security certification, but rather that the State Department violated Title VII by *subjecting* him (and all U.S. citizens) to the security certification process in the first place. Regardless, the court need not decide whether *Egan* applies to the State Department's security certification decision because the *Egan* bar does not implicate the court's subject matter jurisdiction, *see Oryszak v. Sullivan*, 576 F.3d 522, 525 (D.C. Cir. 2009) (reviewing a motion to dismiss under *Egan* under Rule 12(b)(6), and not for lack of subject matter jurisdiction under Rule 12(b)(1)), and because the court rules in favor of Defendant on the alternative ground that Plaintiff has failed to make out a prima facie case of national origin discrimination. Similarly, the court need not decide whether Plaintiff failed to timely exhaust his discrimination claim, and

if so, whether that claim should be equitably tolled or whether Defendants waived an exhaustion defense. *See* Defs.' Mot. at 5–9; Pl.'s Opp'n, at 19–24. Plaintiff's Title VII claim fails whether it is timely or not. Summary judgment is granted as to Count I.

## V.

Plaintiff alleges a Title VII retaliation claim in Count II, but it is difficult to discern which adverse events Plaintiff contends resulted from his protected activity. Plaintiff alleges that "[u]pon information and belief, State and DOJ *took many if not all* of the adverse actions since 2012 . . . partially in retaliation for Garcia's protected activity." FAC ¶ 102 (emphasis added). Plaintiff's pleading thus does not identify with specificity which non-hiring events, or "non-selections," he contends were retaliatory. His opposition brief adds little clarity. *See* Pl.'s Opp'n at 19 (asserting that he "exhausted all the claims he needed to exhaust" (capitalization altered)), 30–32 (identifying no retaliatory non-selections other than the exhausted claims identified by Defendants). The court is under no obligation to attempt to divine what Plaintiff has not made clear. So, the court will consider only the non-selections on April 10, 2014, and July 1, 2014, which both sides agree are exhausted, as the subject of Plaintiff's retaliation claim.[1] *See* FAC ¶¶ 82, 86; Defs.' Mot. at 12–13 (Plaintiff "administratively exhausted his retaliation claim with respect to only two of those nonselections: his April 2014 and July 2014 nonselections"); Pl.'s Opp'n at 19–20.

As to those non-selections, Defendants argue that summary judgment is warranted because Plaintiff "cannot show that any of the selecting officials knew about his Title VII protected activity,

---

[1] To the extent that Plaintiff asserts that his non-selections on January 4, 2013, FAC ¶ 71, and February 1, 2013, *id.* ¶ 74, are part of his retaliation claim, those claims are not exhausted. Even when he attempted to amend his administrative complaint via email on August 9, 2013, to include these early-2013 non-selections, Plaintiff did not assert that they resulted from retaliation. Rather, he described these "non-selections as effects of an ongoing pattern of discrimination stemming from the initial use of the wrong security test." Pl.'s Opp'n, Ex. K, ECF No. 19-11, at 5. Thus, Plaintiff never attempted to amend his administrative complaint to add a retaliation claim covering the early-2013 non-selections.

thus defeating his claim that they retaliated against him on account of that activity." Defs.' Mot. at 15. To support this position, Defendants submit sworn declarations from the hiring official (Attaché Robert Chiaffa) and two others who provided input on the hiring decision (Deputy Attachés Thomas Radcliffe and Ray Gatinella), each of whom states that he was not aware of Plaintiff's prior EEO activity. Statement of Facts ¶ 13; Defs.' Mot., Ex. 12, Aff. of Robert Ciaffa, ECF No. 15-14, at 18–19 ("I am still not aware that any of the candidates had any prior EEO activity."); Ex. 14, Aff. of Thomas Ratcliffe, ECF No. 15-16 [hereinafter Ratcliffe Aff.], at 12 ("[A]s far as I know, I did not learn anything about any prior claims that the Complainant may have made until fairly recently . . . certainly after he was already pursuing at some level a complaint against the Department of Justice."); Ex. 15, Aff. of Ray Gattinella, ECF No. 15-17, at 15 ("[P]rior to the interview of [Plaintiff] I had no knowledge of any EEO complaints or anything that he had filed."). In response, Plaintiff notes that he "testified that he discussed his prior EEO activity with the hiring officials in the interview after they started asking questions about his relationship with the Embassy." Pl.'s Opp'n at 31. Plaintiff also points to corroboration of his testimony by two other witnesses. *Id.* (citing Pl.'s Opp'n, Ex. V, Aff. of Alejandro Gonzalez, ECF No. 19-22, at 10; Ratcliffe Aff. at 13).

Although Plaintiff's testimony is not entirely clear, it is sufficient to create a genuine dispute of material fact as to whether hiring officials in April 2014 were aware of his protected activity. *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 298 (D.C. Cir. 2015) ("We accept that a plaintiff's own firsthand observations of relevant facts are probative evidence, and that we must not set them aside merely because they come from a party who necessarily has a stake in the outcome."). Asked whether anyone at the interview he attended in March 2014 asked him specific questions about the EEO complaint, Plaintiff responded, "Yes. They did ask

questions about it." Pl.'s Opp'n, Ex. U, Dep. of Gustavo Garcia, ECF No. 19-21, at 36. Plaintiff said that his interviewers asked him "open-ended questions, what the case was about and . . . also about my security certification and why I believe I had been denied a security certification." *Id.* Plaintiff thus has created a genuine dispute of material fact as to whether hiring officials knew of his specific Title VII protected activities when they did not hire him in April 2014. As to this aspect of Plaintiff's retaliation claim, summary judgment is denied.

The court reaches a different conclusion as to the non-selection in July 2014. As to that opening, Plaintiff does not dispute that an eligible family member was a candidate for the position and that, due to a State Department policy granting preference to family members, Plaintiff's application was not forwarded for consideration. Statement of Facts ¶¶ 15–16; Pl.'s Resp. to Facts ¶¶ 15–16. Defendants thus have offered an unrebutted, non-retaliatory reason for Plaintiff's non-hiring in July 2014. Plaintiff concedes as much. *See* Pl.'s Opp'n at 33. He nevertheless points out that the family member in question did not complete the security clearance process, and the agency did not re-advertise the position. *Id.* Plaintiff argues that "[a]n open and material question therefore remains as to whether the reason OIA did not readvertise the position was that it did not want to hire Garcia." *Id.* But even if that "open and material question" could support a retaliation claim, Plaintiff offers no evidence to suggest that the reason the position remained unfilled was to retaliate against Plaintiff. He thus has failed to show any genuine dispute of material fact as to the decision not to hire. Accordingly, as to the July 2014 non-selection, summary judgment is granted in favor of Defendants on Plaintiff's retaliation claim.

VI.

In Count III, Plaintiff brings an APA challenge to the State Department's failure to follow a provision within the agency's Foreign Affairs Manual ("FAM"), specifically, 3 FAM 7222.

3 FAM 7222 is the policy that governs the use of security certifications; at the time that Plaintiff filed his complaint, that provision applied to "Foreign Service Nationals Only." *See* FAC ¶¶ 27–28. Plaintiff is not a Foreign Service National because he is a U.S. citizen. *Id.* ¶¶ 3, 24. Therefore, according to Plaintiff, by applying 3 FAM 7222 to Plaintiff and other U.S. citizens, the State Department violated its own regulations, thereby making "[t]he processing of a U.S. citizen for a security certification . . . arbitrary, capricious, an abuse of discretion, or otherwise contrary to law." *Id.* ¶ 106.

Since that time, however, the State Department has updated its policy manual to reflect that 3 FAM 7222 applies to all "locally employed staff" and not just Foreign Service Nationals. *See* Defs.' Mot., Ex. 19, 3 FAM 7220 "Processing for Employment," ECF No. 15-21 (showing an updated policy as of December 2018). That change means the court cannot afford Plaintiff the prospective injunctive relief that he seeks under the APA. *See* FAC ¶ 108. Count III therefore is now moot. Plaintiff does not contend otherwise. Pl.'s Opp'n at 29–30 & n.16. Defendants' Motion is granted as to Count III.

## VII.

In Count IV Plaintiff alleges a violation of Due Process under the Fifth Amendment. His claim is that the State Department's wrongful denial of a security clearance, without first affording him an opportunity to defend himself and clear his name, deprived him of a liberty interest in his reputation. FAC ¶¶ 113–115. As a consequence of this deprivation, Plaintiff claims to have "suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities." *Id.* ¶ 115.

The D.C. Circuit has recognized two legal theories—which the parties conflate—to establish a due process violation based on reputational injury. The first, known as "reputation

plus," requires "the conjunction of official defamation and [an] adverse employment action." *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998). The second is known as the "stigma plus" theory. It "differs from the [reputation-plus theory] in that it does not depend on official speech, but on a continuing stigma or disability arising from official action." *Id.* "In other words, where a 'reputation plus' theory requires some form of defamatory or stigmatizing speech by the government, the latter depends only on governmental imposition of 'a continuing stigma or other disability arising from official action' that 'foreclosed the plaintiff's freedom to take advantage of other employment opportunities.'" *Jefferson v. Harris*, 170 F. Supp. 3d 194, 205 (D.D.C. 2016) (emphasis omitted) (quoting *O'Donnell*, 148 F.3d at 1140). In this case, Plaintiff pursues only a stigma-plus theory.[2] He maintains that, "if the defamatory information is contained within an individual's file and would be publicly available to future [government] employers or other government personnel, that is [ ] sufficient to satisfy the standard." Pl.'s Opp'n at 42.

Under the stigma-plus line of cases, "a government action that potentially constrains future employment opportunities must involve a tangible change in status." *Kartseva v. Dep't of State*, 37 F.3d 1524, 1527 (D.C. Cir. 1994). Such "tangible change" can be shown in one of two ways. The first is if the government's action "formally or automatically excludes" the plaintiff from "from other government employment opportunities," such as by official debarment or some other "binding determination to disqualify." *Id.* at 1528. Plaintiff identifies no such "binding" decision here by the State Department. *See* Pl.'s Opp'n at 43 (asserting that the "practical effect" of the adverse security certification decision is to deny him future job prospects with the U.S. Embassy).

---

[2] It is evident that Plaintiff eschews any reliance on a "reputation plus" claim, as he disavows the need to establish the critical element of public disclosure, *see* Pl.'s Opp'n at 42 (arguing that "'public disclosure of the denial of his security certification' is [not] necessary") (citation omitted). *See Orange v. District of Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995) ("[I]njury to reputation cannot occur in the absence of public disclosure of the allegedly damaging statements.").

He, therefore, must rely on the second method: In the absence of a "binding" disqualification, the government action must have "a *broad* effect of largely precluding [the plaintiff] from pursuing [his] chosen career." *Kartseva*, 37 F.3d at 1528. This standard presents a "high" bar. *Taylor v. Resolution Tr. Corp.*, 56 F.3d 1497, 1506 (D.C. Cir.)*, opinion amended on reh'g*, 66 F.3d 1226 (D.C. Cir. 1995). The employee must show that the government has "seriously affected, if not destroyed, his ability to obtain employment in [his] field." *Id.* (quoting *Greene v. McElroy*, 360 U.S. 474, 492 (1959)).

Plaintiff fails to produce evidence to meet this stringent standard. For one, Plaintiff's "chosen career" is far from clear. According to his complaint, Plaintiff is an immigration attorney with U.S. and Mexican law degrees, FAC ¶ 44, but the positions he sought range from "Legal Assistant Resident Legal Advisor," *id.* ¶ 45, to "Investigator," *id.* ¶ 60, to "Political/Legal Specialist," *id.* ¶ 63, and "Paralegal," *id.* ¶ 75. Plaintiff's "chosen career" is therefore uncertain. Moreover, Plaintiff has not established the "*broad* effect" required to establish a constitutionally cognizable injury under the stigma-plus theory. Plaintiff's claimed reputational harm is narrow. He says that "[t]he practical effect of the current state of affairs is that any office in the Embassy (which is virtually the only game in town for U.S. Government work in Mexico) considering Garcia for employment will query the RSO for information . . . ," which will result in disclosure of his denied security certification. Pl.'s Opp'n at 43. Thus, Plaintiff asserts a limited scope of impaired employment prospects: those with the U.S. Embassy in Mexico or, more charitably construed, with the U.S. government in Mexico that require some security clearance. But "[t]he 'loss of some employment opportunities does not amount to an alteration of a legal right,' particularly when the loss of employment flows directly from the modification of a security clearance, which itself represents only a change in the terms of an agency's exercise of its

discretion." *U.S. Info. Agency v. Krc*, 905 F.2d 389, 397 (D.C. Cir. 1990) (cleaned up) (quoting *Mosrie v. Barry*, 718 F.2d 1151, 1162 (D.C. Cir. 1983)). In any event, Plaintiff offers no evidence of broad preclusion of employment. He has not shown that he is foreclosed from U.S. government positions outside of Mexico (he is a U.S. citizen); positions in Mexico or elsewhere not requiring a security clearance; or, more broadly, immigration law-related work in the private sector. His Fifth Amendment claim therefore cannot survive summary judgment. *See O'Donnell*, 148 F.3d at 1141–42; *Evangelou v. Dist. of Columbia*, 639 Fed. Appx. 1, 3 (D.C. Cir. 2016).

## VIII.

In Count V, Plaintiff alleges that when the State Department "denied [him] a security certification based on his First-Amendment protected activities, it violated his rights under the Constitution." FAC ¶ 120. In his briefing, Plaintiff further details his belief that he was denied a security certification due to his membership in political organizations and movements, his distribution of pamphlets and newspapers, and his creation of an immigrants' rights organization. Pl.'s Opp'n at 40. As evidence, Plaintiff points to a file from the Embassy's Regional Security Office, which details his involvement with political, professional, and social organizations, as well as contacts with Embassy security staff. Pl.'s Opp'n, Ex. D, ECF No. 19-4 [hereinafter RSO File]. For example, the RSO file details an incident in 2004 during which Garcia and another man were believed to be handing out fliers and talking to visa applicants outside the Embassy. *Id.* at 4–5. Defendants argue that Plaintiff's First Amendment claim is unreviewable and fails on the merits. Defs.' Mot. at 21–22.

## A.

At the outset, the court must decide if Plaintiff's First Amendment claim is foreclosed by *Department of the Navy v. Egan*. Defendants argue that because the State Department's decision

to deny Plaintiff a security certification was "unreviewable under *Egan* and falls outside of the exceptions established by the D.C. Circuit, Garcia's First Amendment claim is nonjusticiable." Defs.' Mot. at 21.  The court disagrees.

The D.C. Circuit consistently has held that valid constitutional claims are not foreclosed by *Egan*.  In *Ryan v. Reno*, the D.C. Circuit held that, although *Egan* precludes judicial review of an adverse employment action under Title VII based on the denial or revocation of a security clearance, *Egan* "does not apply to actions alleging deprivation of constitutional rights."  168 F.3d 520, 524 (D.C. Cir. 1999).  In *United States Information Agency v. Krc*, the D.C. Circuit cautioned that "judicial authority to consider the constitutional claims resulting from agency personnel decisions" is of "critical importance" because "those constitutional claims may well be the *only* check on agency actions that determine a person's career."  905 F.3d at 400.  Accordingly, "[c]ourts have an obligation to listen to those claims clearly and to consider them carefully."  *Id.* And, in *National Federal of Federal Employees v. Greenberg*, the D.C. Circuit held that *Egan* did not bar a constitutional challenge to a Department of Defense security clearance questionnaire, stating that "[i]t is simply not the case that all security-clearance decisions are immune from judicial review."  983 F.2d 286, 289 (D.C. Cir. 1993) (collecting cases).

To be sure, merely mouthing a constitutional claim will not do.  A plaintiff cannot avoid *Egan* by asserting "a wholly frivolous constitutional claim or an immaterial one advanced solely for the purpose of circumventing *Egan*."  *Palmieri v. United States*, 896 F.3d 579, 585 (D.C. Cir. 2018) (internal quotation marks omitted)).  But *Egan* does not stand in the way of a well-pleaded constitutional claim that, as here, would appear to have record support.  *Egan* therefore does not forbid consideration of Plaintiff's First Amendment claim.

B.

A First Amendment retaliation claim has four elements: (1) "the public employee must have been speaking on a matter of public concern"; (2) a court needs to "balance the interest of the employee as a citizen, in commenting upon matters of public concern and the interest of the employer in promoting the efficiency of the public services it performs through its employees"; (3) "the employee must prove that her speech was a substantial or motivating factor in the denial of the benefit that she sought"; and (4) "the government employer must be given an opportunity to prove that it would have reached the same decision even absent the protected conduct." *Tao v. Freeh*, 27 F.3d 635, 638–39 (D.C. Cir. 1994) (internal quotation marks and citations omitted).[3] The first two questions are questions of law for the court, while the second two are questions of fact to be presented to a jury. *Id.* at 639. "[T]he First Amendment protects government employees from even an act of retaliation as trivial as failing to hold a birthday party for a public employee when intended to punish her for exercising her free speech rights." *Id.* (cleaned up) (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 n.8 (1990)). At the same time, "only where the employee's speech touches on a matter of public concern, and only where the employee's First Amendment interest is not outweighed by any disruption that the speech may cause to the efficiency of the public enterprise, is that speech constitutionally protected." *Id.*

Plaintiff has provided ample evidence to create a genuine dispute of material fact as to whether he was denied a security certification due to his exercise of First Amendment rights. Plaintiff was involved in political and social organizations that spoke on matters of public concern, namely, the rights of immigrants and visa applicants, *cf. Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*, 319 F. Supp. 3d 491, 504 (D.D.C. 2018) (observing that "the public

---

[3] Although Plaintiff did not secure employment and therefore never became a "public employee," neither side proposes using a different test for Plaintiff.

also has an interest in ensuring that its government respects the rights of immigrants to family integrity while their removal proceedings – or in this case, asylum proceedings – are pending"), and he has shown that the Embassy, through the RSO, collected information pertaining to these expressive activities and maintained a file on them. *See* RSO File. A reasonable jury could conclude that such protected activities played a substantial or motivating factor in rescinding his job offer. *See Tao*, 27 F.3d at 639.

Defendants nevertheless insist that Plaintiff was denied a security clearance because "he provided false information to visa applicants and assisted in circumventing immigration law," Defs.' Mot. at 22, and because "he had for several years exhibited anger and opposition towards the United States embassy and its activities," Reply in Supp. Of Defs.' Mot., ECF No. 24 [hereinafter Defs.' Reply], at 19. Defendants present, at best, weak evidence to support these claims. Defendants offer no evidence that Plaintiff supplied false information to visa applicants or assisted in circumventing the law. *See* Defs.' Mot. at 22 (citing only the FAC). And, insofar as Defendants' contention that Plaintiff "exhibited anger and opposition" towards the United States, that description is tenuously, if at all, supported by the evidence. *See* Pl.'s Opp'n, Ex. E, ECF No. 19-5 [hereinafter Ex. E]; Haley Dep. At 30–31, 121. The cited evidence shows that Plaintiff, at various times, passed out flyers near the Embassy concerning the visa process; edited a book about the visa process; created an organization dedicated to defending immigrant rights that filed non-descript complaints against the Embassy; and established a business near the Embassy to help immigrants. *See* Ex. E. None of cited evidence permits a finding that Plaintiff's First Amendment activities played little or no role in revoking his job offer.

Additionally, Defendants argue that, even if Plaintiff's protected speech was a substantial or motivating factor in the denial of the security certification, the court should hold, as a matter of

law, that the State Department's interests outweigh Plaintiff's in this case.  Defs.' Mot. at 22;

Defs.' Reply at 19 ("The security concerns inherent in an overseas American embassy hiring a

local resident opposed to that embassy's activities hold greater weight than the speech rights

claimed by [Plaintiff].");  *see Tao*, 27 F.3d at 639 (stating that the balancing of the employee's

interest with that of the government as employer is question of law for the court to resolve).  Based

on the limited record, the court is unconvinced that the balancing in this case tips in favor of the

government.  The evidence relied upon by Defendants to show that Plaintiff's expressive activities

presented genuine security concerns is, at most, vague and is heavily reliant on hearsay.  *See*

Ex. E; Haley Dep. at 30–31, 121.  Summary judgment is denied as to Count V.

## IX.

In Count VI, Plaintiff alleges that Defendants violated the Privacy Act by maintaining

"information about U.S. citizens' First Amendment-protected activities in records about the

processing of them for security certifications."  FAC ¶¶ 123–129.  "The Privacy Act of 1974

'safeguards the public from unwarranted collection, maintenance, use and dissemination of

personal information contained in agency records . . . by allowing an individual to participate in

ensuring that his records are accurate and properly used.'"  *Henke v. U.S. Dep't of Commerce*,

83 F.3d 1453, 1456 (D.C. Cir. 1996) (quoting *Bartel v. F.A.A.*, 725 F.2d 1403, 1407 (D.C. Cir.

1984)); 5 U.S.C. § 552a.  To that end, the Act requires that agencies keep certain records systems

and publish annual reports.  *Henke*, 83 F.3d at 1456; *see also Doe v. Chao*, 540 U.S. 614, 618

(2004) ("The Act gives agencies detailed instructions for managing their records and provides for

various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply

with the requirements.").  Subsection (e)(7) of the Act prohibits agencies from maintaining records

"describing how any individual exercises rights guaranteed by the First Amendment unless

expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). The "law enforcement activity" exception is at issue here.

The Act itself does not define "law enforcement activity," but the D.C. Circuit has "interpreted the phrase broadly," to include "authorized criminal, intelligence, or administrative investigation(s)." *Maydak v. U.S.*, 363 F.3d 512, 517 (D.C. Cir. 2004) (citing *Nagel v. Dep't of Health, Educ. & Welfare*, 725 F.2d 1438, 1441 n.3 (D.C. Cir. 1984)). Further, "valid law enforcement activities require neither an active investigation nor a 'current law enforcement necessity.'" *Id.* (quoting *J. Roderick MacArthur Found. & Lindblom v. FBI*, 102 F.3d 600, 603 (D.C. Cir. 1996)). In *Maydak*, the Circuit held that declarations of prison officials were sufficient to conclude that "[b]ecause [the Federal Bureau of Prisons] has responsibility for preserving prison security . . . examining photographs for conduct that may threaten that security is pertinent to and within the scope of an authorized law enforcement activity." *Id.* In addition, "reviewing inmate photographs for gang-related activity and obscene conduct also falls within that exception." *Id.* The declarations also established, however, that "some prisons may have reviewed and collected the photographs for other purposes as well" and the court was not satisfied by the explanation that the photographs were for "investigative or informative value." *Id.* Accordingly, the Circuit remanded the issue to the district court to determine "on the basis of a fuller record" whether the review of the photographs fell within the exception. *Id.*

In this case Defendants argue that their collection of information pertaining to Plaintiff's First Amendment-protected activities should fall under the "law enforcement activity" exception because "Regional Security Officers are Diplomatic Security service special agents responsible for implementing and managing the Department's security and law enforcement programs at

Foreign Service posts, and the information that its officers collected about [Plaintiff] was pursuant to that authority." Defs.' Mot. at 20 (quoting 12 FAM 422.1(a)[4]) (cleaned up). Further, Defendants say that 12 FAM 422.5(a)(18)[5] authorizes the RSO to conduct background investigations for "all applicants for third-country national and [locally employed staff] positions" and "evaluat[e] all information developed as a basis for the issuance or denial of a security certification for employment." Defs.' Reply at 18 (quoting 12 FAM 422.5(a)(18)).

For his part, Plaintiff does not dispute the general proposition that "the RSO conducted an administrative investigation into him." Pl.'s Opp'n at 37. Instead, he argues that the RSO's collection of information in this case was not "authorized," because the FAM as written in 2010 authorized security certification investigations of only Foreign Services Nationals, which excludes U.S. citizens *See id.* Plaintiff contends that the subsequent amendment of the FAM to authorize investigations of U.S. citizens does not cure the initial Privacy Act violation. *See id.* at 37–38.[6]

The court lacks sufficient information to grant summary judgment in Defendants' favor. Defendants have not provided any affidavits or declarations that would give the court insight into the purpose for which the information about Plaintiff was collected and maintained. *See* Defs.' Mot. at 19–20; Defs.' Reply at 18. Specifically, it is unclear whether any of the contested records are connected to a security certification investigation or were created for some other purpose. The RSO file produced by Plaintiff consists of two records. *See* RSO File. The first is an undated, three-page document that identifies Plaintiff's affiliation with various organizations and describes various contacts between Plaintiff and the Embassy from 2004 to 2009. *See id.* at 1–3. Nothing

---

[4] Available at https://fam.state.gov/FAM/12FAM/12FAM0420 html.
[5] Available at https://fam.state.gov/FAM/12FAM/12FAM0420 html.
[6] Unlike his APA claim, Plaintiff's Privacy Act claim is not rendered moot by the FAM's revision because, under the Privacy Act, Plaintiff can be awarded statutory damages for *past* violations. *See* 5 U.S.C. § 552a(g)(4); *Chao*, 540 U.S. at 620.

on the face of the document explains its provenance. The second record is a memorandum dated August 17, 2004—nearly six years before Plaintiff applied for a job with the Embassy, FAC ¶ 47—that details a run-in with Plaintiff outside the Embassy while he was passing out flyers containing visa information and an unsuccessful effort to bring criminal or civil charges against him for that conduct. *See* RSO File at 4–5. Defendants supply the court with no facts about that memorandum, although based on its date, it would appear to have a purpose other than a security certification. In any event, on the record before it, the court cannot determine whether the records maintained by the RSO about Plaintiff are "pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. § 552a(e)(7). Summary Judgment is denied as to Count VI.

## X.

Finally, in Count VII, Plaintiff brings an APA claim for the State Department's failure to follow 12 FAM 423.7, which forbids FSNIs from accessing the security files of U.S. citizens. 12 FAM 423.7(b) ("FSNIs are prohibited from accessing the security files of U.S. citizens . . . .").[7] According to the Amended Complaint, during the course of EEO proceedings, the State Department "confirmed that the Mexico City Embassy stores all the security files of ORs, including U.S. citizens, in the FSNI office, and that FSNIs have unrestricted access to them," FAC ¶ 90, in direct violation of 12 FAM 423.7. Plaintiff asserts that he, and all other class members, are "entitled to relief [under the APA] in the form of a declaratory order . . . and an injunction compelling [the State Department] . . . to follow its self-imposed mandate of 12 FAM 423.7." FAC ¶ 133.

Although Defendants do not raise the issue of standing, the court does so of its own accord and finds it wanting. *See Lee's Summit, MO v. Surface Transp. Bd.*, 231 F.3d 39, 41 (D.C. Cir.

---

[7] Available at https://fam.state.gov/FAM/12FAM/12FAM0420 html.

2000) ("When there is doubt about a party's constitutional standing, the court must resolve the doubt, *sua sponte* if need be."). "A plaintiff must demonstrate standing separately for each form of relief sought." *Cierco v. Mnuchin*, 857 F.3d 407, 416 (D.C. Cir. 2017) (cleaned up) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)). To establish constitutional standing, a plaintiff must satisfy three elements: "(1) [he] must have suffered an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury must be fairly traceable to the challenged action of the defendant; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 81 (2012) (internal quotation marks omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Where a plaintiff "seek[s] only forward-looking injunctive and declaratory relief, 'past injuries alone are insufficient to establish standing.'" *Id.* at 82 (quoting *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011)). Rather, the plaintiff "must show that he is suffering an ongoing injury or faces an immediate threat of injury." *Dearth*, 641 F.3d at 501. For example, in *City of Los Angeles v. Lyons*, the Supreme Court held that Lyons lacked standing to seek an injunction— an equitable remedy—because he failed to show that "he was likely to suffer future injury from the use of the chokeholds by police officers." 461 U.S. 95, 105. "That Lyons may have been illegally choked by the police [five months earlier] . . . does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him." *Id.* Accordingly, Lyons was not able to "demonstrate a case or controversy with the City that would justify the equitable relief sought." *Id.*

In this case, Plaintiff is at the summary judgment stage, and he can no longer rely on general

factual allegations to establish injury. *See Lujan*, 504 U.S. at 561. Instead, he must "'set forth' by affidavit or other evidence 'specific facts'" supporting his claimed injury. *Id.* (quoting Fed. R. Civ. P. 56(e)). Plaintiff has not come forward with any evidence of past injury resulting from an FSNI actually accessing his "security file," nor has he shown that FSNIs continue to have access to his file in such a way that portends a future concrete, actual injury. At most, Plaintiff rests on the allegations in his Amended Complaint, but that is not enough at this stage.

In fairness, because discovery has not commenced, Plaintiff arguably has not had a sufficient opportunity to develop the factual record to support his standing to bring this claim. Accordingly, the court will not grant summary judgment at this time in favor of Defendants on standing grounds. In the future, Defendants may wish to revisit the issue of standing, or any other argument as to this APA claim that the court has not addressed. The court does not reach such arguments here, however, because it is not clear it has jurisdiction to do so. Defendants' Motion as to Count VII is denied.

XI.

For the foregoing reasons, the court grants Defendants' Motion as to Counts I, III, IV in full and Count II in part. Defendants' Motion is denied in full as to Counts V, VI, and VII and Count II in part.

Dated: January 13, 2020

Amit P. Mehta
United States District Judge

24